IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JIMMY HERRERA,

       Plaintiff,

v.                                                        CIV 02-24  KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Plaintiff's Motion to Reverse or Remand where only his mental impairment is at issue.  *Doc. 14.*  Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.  The entire voluminous record has been carefully read and considered.  I appreciate the detailed and thorough briefs of the parties and have given them due consideration.  Although I find that the Administrative Law Judge ("ALJ") applied the correct legal standards in her listing analysis, part of her residual functional capacity analysis is flawed and consequently unsupported by substantial evidence.  I therefore grant Plaintiff's motion in part and remand the matter to the Commissioner for additional proceedings.

### I.  Procedural Background

Plaintiff Jimmy Herrera worked as a laborer until August 15, 1987, when he was thirty-one years old.  He ceased working at Los Alamos National Laboratory on that date due to a back injury he suffered while unloading equipment.  Efforts at conservative care for his back were

unsuccessful and Plaintiff did not undergo surgery.  Efforts at vocational rehabilitation to set up

his own business also evidently failed because Plaintiff was not employed after 1987.  Four years

after the back injury and a year after settling his Worker's Compensation claim, on August 27,

1991, Plaintiff filed his first application for benefits on the basis of his back injury, presumably

alleging the onset date as of the date he ceased working.  The application was denied at the outset

on December 16, 1991, and Plaintiff did not pursue the matter further.  *See Administrative*

*Record* ("*Record*") at 78-80, 84, 130, 140, 154, 157-71, 237-38, 368.

     A year and a half after the initial denial, however, he filed a second application for benefits

on April 30, 1993, alleging the same back injury and an onset date as of the date he ceased

working.  This claim was also denied.  *See id.* at 80-103 (denied on July 20, 1993).  This time,

however, Plaintiff filed requests for reconsideration and a hearing and, in addition to the 1987

back injury, further alleged as disabling conditions anxiety, panic attacks, depression, and

additional injury to his back from a recent automobile accident.  *See e.g. id.* at 104, 126, 136,

144, 155.

     After a hearing, Administrative Law Judge ("ALJ") Carol A. Connor issued a decision that

limited consideration to Plaintiff's status after December 16, 1991– the date of the denial of his

first application.  She found that Plaintiff's back and medical conditions did not meet a Listing,

that he was capable of simple, unskilled, sedentary or light work, and that the Grids directed a

finding of not disabled.  *See id.* at 366-372 (hereinafter "1995 Connor Decision").  On March 12,

1996, the Appeals Council remanded because ALJ Connor did not call a vocational expert and

because there was recent new evidence that Plaintiff's mental condition had deteriorated.  The

Council directed ALJ Connor to obtain additional evidence concerning Plaintiff's mental

condition, reevaluate his residual functional capacity, and secure the services of a vocational expert. *See id.* at 383-84.

Upon remand, Disability Determination Services referred Plaintiff to psychologist Robert Krueger for a consultive evaluation. On April 19, 1996, Dr. Krueger interviewed Plaintiff, conducted a mental status evaluation, and administered the Wechsler Adult Intelligence Scale–Revised ("WAIS-R"), which is an intelligence quotient test. From his examination of Plaintiff and the results of the WAIS-R showing a full scale score of 68, Dr. Krueger concluded that plaintiff is "mildly retarded" and "very much doubt[ed] that [Plaintiff] is capable of working for a living." *Id.* at 414; *see also* 410-413, 417.

On a "Medical Assessment of Ability To Do Work-Related Activities (Mental)," Dr. Krueger rated as "fair" Plaintiff's ability to follow work rules, use judgment, interact with supervisors, deal with complex instructions, maintain personal appearance, and demonstrate reliability. *Id.* at 415-16. He rated as "poor or none" Plaintiff's ability to relate to coworkers, deal with the public, deal with stress, function independently, maintain attention/concentration; deal with noncomplex but detailed instructions; and deal with simple instructions. *Id.* Dr. Krueger did not explain why he believed Plaintiff had a "fair" ability to "understand, remember and carry out complex job instructions," but only had a "poor" or no ability to "understand, remember and carry out [either] simple [or noncomplex but detailed] job instructions." *See id.* at 416.

Neither party disputes that ALJ Connor was dissatisfied with Dr. Krueger's evaluation. In fact, a DDS employee wrote to Dr. Rayme Romanik, a DDS reviewing physician, asking: "Judge O'Connor doesn't like the CE by Dr. Krueger, what do you suggest? If we repeat the WAIS, will

it be valid?  Your opinion . . . will be greatly appreciated."  *Id.* at 486; *see also Doc. 18* at 5-6.
Dr. Romanik had Peggy A. Keilman, "Ph.D.," presumably a psychologist, review the record and
Dr. Krueger's report.  *Record* at 486.

As for Plaintiff's alleged mental retardation, Dr. Keilman questioned the validity of the
WAIS-R scores because:  no other medical records note mental retardation; despite Plaintiff's
claim that he did not graduate from high school, records show that he indeed graduated; his
"standardized tests" (without citation to where she found this evidence, in context presumably she
meant a test as a teenager) finding that he had a "Total Aptitude show[ing] P.R. of 82;" Plaintiff
corrected portions of a psychiatrist's 1994 evaluation; and a September 1995 note indicates that
Plaintiff works for "an hour or two at a time."  *See id.* at 487, 489.  She found "no compelling
reason to test claimant again.  Decision can be reached on evidence in the file."  *Id.* at 490.  She
further was of the opinion that Plaintiff's psychological problems were situational (with
deterioration corresponding to events such as his wife moving out, divorce, bankruptcy, fire in his
home, a young sibling's suicide, and his father's death) and also partially caused by the addictive
prescribed medicine he was taking.  *See id.* at 487-90.

After conducting another hearing and denying Plaintiff a second hearing, ALJ Connor
again limited her inquiry to post-December 16, 1991.  A vocational expert was at the hearing but
did not testify.  *Id.* at 516.  ALJ Connor again rejected Dr. Krueger's assessment as establishing
mental retardation, and again found him not disabled based on the Grids.  *See id.* at 497, 500.

The Appeals Council again remanded because ALJ Connor failed to call a vocational
expert as previously required and because her decision did not "provide adequate rationale in
support of the claimant's determined mental limitation, nor does it describe these mental

4

limitations in specific functional terms." *Id.* at 516.  The Appeals Council directed that another ALJ be assigned on remand and directed that the new ALJ:  update Plaintiff's medical records from treating physicians; clarify the nature and severity of his mental impairments; reevaluate Plaintiff's residual functional capacity in accordance with Social Security Ruling 96-8p; and secure the services of a vocational expert.  *Id.* at 516-17.

ALJ Mary Ann Lunderman held another hearing on November 2, 1999 and employed the assistance of a medical expert.  *See id.* 581-626.  The medical expert, psychologist Star Vega, essentially concurred with Dr. Keilman's assessment of Plaintiff's mental and psychological impairments and concluded Plaintiff does not meet any Listing.  *See id.* at 596-611.

Dr. Vega specifically testified that some of Dr. Krueger's test results were so low that they indicated "profound brain damage," yet Plaintiff attended school and worked as a laborer. *Id.* at 603.  Dr. Vega further testified that Plaintiff's life stressors and tendency "to worsen when he's presenting to anybody that's going to effect his future," accounted for his reported abilities, panic attacks and periods of depression.  *Id.* at 601, 604-06.  She noted that according to medical records, medication helped with his psychological problems.  Moreover, given the number of medications he takes, it is unlikely that the medications did not help him as Plaintiff contended. *See id.* at 596, 605.  Dr. Vega concluded that Plaintiff did not meet Listing 12.05 and his psychological limitations would only "very slightly" effect his ability to function in a normal work setting involving one- to three-step procedures.  *Id.* at 607, 609.

ALJ Lunderman also employed the services of a vocational expert.  Consistent with Dr. Vega's testimony, she included the restriction to simple, repetitive, one- to three-step tasks in her hypothetical.  *Id.* at 613.  The vocational expert identified linen room attendant, order clerk, and

5

cashier as jobs Plaintiff could perform at the light sedentary level. *Id.* at 22, 614. When Plaintiff's non-attorney representative asked whether any job would be available if, as Plaintiff testified, he requires two thirty-minute breaks a day to deal with panic attacks, the vocational expert responded no jobs would be available. *See id.* at 583, 586, 617.

ALJ Lunderman also limited her findings to post-December 16, 1991, rejected all of the treating physician reports concerning Plaintiff's mental limitations, rejected Dr. Krueger's report and the WAIS-R scaled score of 68, and found Plaintiff retains the residual functional capacity for sedentary, simple, unskilled work. *See id.* at 14-24. The Appeals Council affirmed on November 23, 2001, thereby rendering her decision final. *See id.* at 8-9.

This suit followed on January 9, 2002. However, in 2002, the Administration awarded Plaintiff Supplemental Security Income benefits based on his chronic back pain with sciatica, obesity, dry rales, and mental limitations associated with depression, anxiety, and panic attacks, in part based on Dr. Krueger's 1996 report. ALJ John Morris found Plaintiff disabled because his resulting residual functional capacity precluded him from engaging in sedentary work on a regular, continuing basis. The ALJ further found the period for these benefits commenced March 6, 2000, which is the his SSI protective filing date. *See Doc. 15,* Exh. A.

## II.  Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d

799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

### III.  Analysis

#### A.  *Period Under Review Is December 16, 1991 to March 6, 2000*

According to Plaintiff, the period under consideration here is August 15, 1987 (the date he alleges his disability began) to March 6, 2000 (the date his SSI benefits began). *E.g., Doc. 15* at 25.  Defendant contends the applicable period is December 16, 1991 (the date of the Commissioner's prior denial as found by the ALJs) to February 25, 2000 (the date of ALJ Lunderman's decision).  Neither party cites any authority for their differing commencement and end dates.

My research reveals that the period commences December 16, 1991.  ALJ Lunderman found the records submitted with Plaintiff's second application "failed to disclose any new and material evidence sufficient to reopen or revise the prior final determination." *Record* at 15; *see also* 20 C.F.R. §404.989(a)(1) ("We will find that there is good cause to reopen a determination or decision if . . . [n]ew and material evidence is furnished").  "'Absent a colorable constitutional claim . . . , a district court does not have jurisdiction to review the Secretary's discretionary decision  not to reopen an earlier adjudication." *Blair v. Apfel,* 229 F.3d 1294, 1295 (10th Cir. 2000) (quoting *Nelson v. Secretary of Health & Human Servs.,* 927 F.2d 1109, 1111 (10th Cir. 1990).  Plaintiff makes no such argument here.

As for when the period closes, I elect March 6, 2000. *See Gatliff v. Apfel,* 80 F. Supp. 2d

1125, 1126 (D. Ore.  2000) (Commission conceded reversal and award of benefits; application

was for closed period ending on date claimant found to be disabled by a subsequent application).

Accordingly, I consider the evidence in the record from December 16, 1991 forward.

### B.  Substantial Evidence Supports The ALJ's Decision That Plaintiff Does Not Meet Listing 12.05(C).

Plaintiff argues that the ALJ erred in finding he does not meet Listing 12.05(C) for mental

retardation at step three.  Resolution of this issue turns on a narrow point raised by Defendant in

its response.  That is, whether the record contains any evidence showing mental retardation before

the age of twenty-two. *See Doc. 18* at 4.  The relevant listing provides that mental retardation

evidenced by a full scale IW score of 60 to 70 as of that age, plus a "physical or other mental

impairment imposing additional and significant work-related limitation of function," is sufficient to

find a disability if the mental retardation "initially ***manifested during the developmental period;***

[that is] the evidence demonstrates or supports onset of the impairment ***before age 22.***"  C.F.R.

Part 404, Subpt. P, App. 1, § 1205(C) (emphasis added).

Consistent with Dr. Krueger's conclusion, ALJ Lunderman found that Plaintiff has only an

assessment of "mild mental retardation" for Listing 12.05. *See id.* at 28; *see also id.* at 16

(characterizing Plaintiff's "borderline intellectual functioning" as "severe" at step two); *id.* at 536-

39 (General Aptitude Test for vocational purposes showed Plaintiff's general intelligence at age

twenty-nine to be "well below average").  The ALJ's opinion does not specifically mention the

twenty-two year criteria and could be clearer on her Listings analysis.  Nevertheless, her

Psychiatric Review Technique Form ("PRT") contains the twenty-two year old limitation and

requires a finding of "significant" subaverage intellectual functioning.  The PRT, coupled with

other reasoning in the ALJ's opinion, lead me to conclude that her ultimate conclusion at step

three is supported by substantial evidence.  In the portion of the opinion I find significant for this

analysis, ALJ Lunderman found that Plaintiff

>obtained his high school degree in 1974, when he was age 17
>(Exhibit 16).  He did not indicate that he required any special
>education classes in high school.   Subsequently, he worked as a
>laborer from 1974 to 1981.  He described his jobs as semiskilled
>work . . . (Exhibit 15).

*Record* at 20.

As support for the contention that Plaintiff meets the Listing, counsel asserts that Plaintiff

"did not graduate from high school."  This assertion is flatly contradicted by the record.  *See*

*Doc. 19* at 2.  At best, the record shows that before ALJ Connor, Plaintiff was vague about his

high school education and stated he did not attend classes all the time.[1]  Later, however, his

equivocation was clarified by three things.  First, his subsequent vocational and disability reports,

signed under the notification that a false statement is punishable by a crime, indicate that he

graduated high school and started working as a laborer.[2]  ALJ Lunderman cites Plaintiff's

---

[1]  *See Record* at 72-74 (Connor hearing 1996: Plaintiff testified he was not in special education and then says he does not know whether he was; Plaintiff testified he does not remember if he graduated from high school, and then stated he had one credit hour to complete high school and was told he would receive his diploma in the mail; Connor orders high school transcripts); *id.* at 411-12 (Dr. Krueger report: Plaintiff is vague about his high school education; told Dr. Krueger he went to 11th grade and did not graduate; reported he had academic difficulties and did not want to go to school because he was shy about speaking in front of class).

[2]  *See Record* at 140 (Exh. 16 disability report: Plaintiff states  highest grade completed was 12th grade in 1974 and he had vocational or special training); *id.* at 130-31 (Exh. 15 vocational report; Plaintiff states he worked as laborer commencing September 1974 and work required use of machines, tools, equipment, technical skills and knowledge); *see also id.* at 208 (Plaintiff reports on doctor appointment form that he completed 12 years in school).

vocational and disability reports to support her conclusion that Plaintiff received a high school

degree in 1974 and thus has a "'high school education'" within the meaning of the regulations.

*Id.* at 23.[3]  Second, his own sworn testimony before ALJ Lunderman indicates he graduated high

school.[4]  Third, his high school transcript shows a graduation date.[5]

     As further support for the proposition that Dr. Krueger's assessment of Plaintiff's "mental

retardation" at age thirty-nine is long-standing, Plaintiff cites his poor performance in high school

and attendance in "special classes."  *See Doc. 19* at 2.  Again, the record does not support the

inference he wishes the court to draw.  Rather, Plaintiff's testimony and high school transcript

establish that Plaintiff was in one "special class" in elementary school, but that he took regular

classes geared toward a vocational career in high school.  Indeed, his high school transcript shows

an IQ of 101 at age thirteen, thereby belying his suggestion that poor grades were the result of

significant mental retardation prior to adulthood.  *See supra,* notes 3-4.

     Moreover, Plaintiff's arguments essentially concede that individuals with an IQ level of the

sort that fits the Listing are capable of working and supporting themselves.  *See Doc. 15* at 17.

He takes no issue with the ALJ's finding that he indeed worked as a laborer from age seventeen

---

[3]  "High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above."  20 C.F.R. § 404.1564; *see also* 20 C.F.R. § 416.964 (same).

[4]  *See Record* at 584-85  (Lunderman hearing: Plaintiff testifies that he "graduated" but didn't attend the graduation ceremony; that he was slow in school; that he took regular classes in high school and one special education class in elementary school); *id.* at 590-591 (Lunderman hearing: Plaintiff testifies that in 5th grade he was in a "slow" class, with "retarded and deformed kids;" that he didn't like to go to high school so he "went to another school to, to get the credits that I needed to graduate, but they said that they would send me a diploma in the mail afterwards, but I never received one").

[5]  *See Record* at 480 (high school transcript showing that Plaintiff had a 101 IQ; graduated in May 1974; got B's, C's, D's and one F; throughout four years of high school, among other things, Plaintiff took English, science, math, typing, reading, shop, welding and vocational education).

through his twenties and beyond.

I therefore find no evidence in this record, much less overwhelming evidence, showing Plaintiff suffered from mental retardation before he was twenty-two years old or, even if he did, that the retardation resulted in significant work-related limitation at that time.  The Commissioner's decision on this point is affirmed.

### C.  Residual Functional Capacity

Plaintiff's next argues that ALJ Lunderman's residual functional capacity assessment is legally erroneous and not supported by substantial evidence because he suffers from a "debilitating panic disorder."  *Doc. 15* at 22.  I disagree.

### (1)  Step Two "Severity" Finding Does Not Automatically Require A Step Four/Five Finding Of Limitation

Plaintiff contends that it was erroneous for the ALJ to find Plaintiff's panic disorder severe at step two without also finding that the attacks pose limitations on his ability to function in a normal work setting at step five.  *Doc. 15* at 21-22; *Doc. 19* at 4.  I am aware that there is dicta in an unpublished Tenth Circuit decision observing "the inconsistency of finding that a pain syndrome is severe at step two and insignificant at step five."  *Duncan v. Apfel,* 1998 WL 544353 at *4 (10th Cir. 1998).  Nevertheless, I am unpersuaded that a step two finding of severity ***automatically*** requires a finding that the condition is conclusively limiting.  Neither the decision nor the regulations and rulings Plaintiff cites stand for that proposition.

The decision relied upon by Plaintiff involves a case where the ALJ ***denied benefits at step two,*** finding the psychological impairments were ***not severe***.  *Roberts v. Callahan,* 871 F. Supp. 497, 500 (D.N.M. 1997).  The ruling he cites provides that a mental impairment that qualifies as

"severe" at step two and does not equal a listing does not necessarily end the inquiry, and the ALJ should proceed to evaluate the claimant's residual functional capacity at step four.[6]

The regulations Plaintiff cites define a step two "severe" impairment as one that has "more than a minimal effect" and "significantly" interferes with basic work activities such as: ability to follow simple instructions; use judgment; and respond appropriately to coworkers, supervisors and work situations. *See* 20 C.F.R. § 404.1520a(d)(1) (referring to 20 C.F.R. § 404.1521); *see also id.,* § 404.1520 (c),(e)-(f); *id.,* §§ 416.920(c), (e)-(f); *id.,* § 416.920a(d)(1); § 416.921. The step two evaluation is made on the basis of the condition alleged and medical evidence alone. "[A]t step two, the ALJ looks at the claimant's impairment or combination of impairments only and determines the impact the impairment would have on his ability to do work." *Hinkle v. Apfel,* 132 F.3d. 1349, 1352 (10th Cir. 1997). If the evidence is unclear whether the impairment qualifies as "severe," the ALJ continues with the next steps in the sequential evaluation process. *E.g., Roberts,* 971 F. Supp. at 500.

In contrast, the step four and five considerations are whether, for this particular claimant, the condition precludes him or her from doing their past work or any work whatsoever. *E.g, Hinkle,* 132 F.3d at 1352 ("At step four, the ALJ engages in a comparative assessment of the

---

[6] The process must go on to consider whether the individual can meet the mental demands of past relevant work in spite of the limiting effects of his or her impairment and, if not, whether the person can do other work, considering his or her remaining mental capacities reflected in terms of the occupational base, age, education, and work experience. The decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work. This decision requires careful consideration of the assessment of RFC.

*Social Security Ruling 85-15,* 1985 WL 56857 at *4.

claimant's residual functional capacity and the demands of the work the claimant has done in the past to determine whether the claimant can do his past relevant work."); 20 C.F.R. §§ 404.1520 (c),(e)-(f);  *id.,* §§ 416.920(c), (e)-(f).  For these reasons I do not find the ALJ's decision internally inconsistent.

### (2)  Dr. Keilman's Report and Dr. Vega's Testimony Are Entitled To Consideration

Plaintiff also asserts that the ALJ's reliance on Dr. Keilman's and Dr. Vega's assessments constitutes error.  This is so, he contends, because ALJ Connor improperly solicited Dr. Keilman's opinion and Dr. Keilman's observations were "manufactured for the purpose of undermining Dr. Krueger's report" to help ALJ Connor.  In other words, he contends that Dr. Keilman's assessment is inaccurate and biased toward a particular result.  He further maintains that because medical expert Dr. Vega relied on and agreed with this "tainted" evidence, her opinions are likewise entitled to no weight.  He appears to contend that the presence of Dr. Keilman's report in the record violated his "due process right to a fair hearing before an unbiased ALJ."  Plaintiff seeks to "strike" Dr. Keilman's report as a remedy for this alleged violation.  *See Doc. 15* at 19; *see also id.* at 20, 24-25; *Doc. 19* at 3.  These arguments fail for a number of independent reasons.

First, Plaintiff cites no authority, much less binding authority, that remedies a problem with a social security proceeding by striking parts of the record.  The only related authority I have found indicates that where an ALJ is biased, and thus deprived a claimant of a fair hearing, the remedy is a new hearing before another ALJ.  *See Ventura v. Shalala,* 55 F.3d 900, 904 (3rd Cir. 1995).

Second, this argument attributes the origin of the "taint" to ALJ Connor's request.  Even

assuming her motive was improper, her proceedings are not before me for review.  Moreover, the regulations appear to permit the Administration to submit the matter to an agency reviewing physician in light of additional evidence submitted before a hearing.  See 20 C.F.R. §§ 404.941 (a) - (b); *see also id.,* § 404.946.  In any event, the Appeals Council appropriately remedied any alleged bias on the part of ALJ Connor by assigning the matter to ALJ Lunderman after the second remand.

Third, Plaintiff was permitted to introduce additional evidence before each hearing, and Plaintiff admits that ALJ Connor proffered Dr. Keilman's report to his representative.  The cornerstones of a fair proceeding in a social security proceeding are giving Plaintiff a meaningful opportunity to present his evidence and a decision based on accurate evidence.  *See Doc. 15* at 19-20, 24-25; *see also Yancey v. Apfel,* 145 F.3d 106, 113 (2nd Cir. 1998); *Allison v. Heckler,* 711 F.2d 145, 147 (10th Cir. 1983).  Here, he makes no argument that the ***substance*** of Dr. Keilman's report is inaccurate.

Indeed, ALJ Lunderman called an independent medical expert from outside the state, who had no prior discussion with anyone involved with the case, and who reviewed the record before her testimony.  *Record* at 523-28, 594, 597.  Dr. Vega was called to give her opinion on, among other things, the "degree of [Plaintiff's] dysfunction . . . and . . . a medical assessment of [his] . . . mental capacity."  *Id.* at 522.  In my extensive review of the record, I set forth a chronology of Plaintiff's mental health appointments and reports, which is attached as Appendix A.

As the Appendix illustrates, the reports of Plaintiff's treating physicians support Dr. Keilman's observation that Plaintiff's psychological problems were situational with deterioration corresponding to events such as his wife moving out, divorce, bankruptcy, fire in his home, a

14

young sibling's suicide, and his father's death.  The reports likewise support Dr. Vega's testimony

that Plaintiff's life stressors and a tendency "to worsen [his condition] when he's presenting to

anybody that's going to effect his future," accounted for his reported abilities, panic attacks and

periods of depression.  *Id.* at 604-06.  Further, according to medical records, medication helped

with his psychological problems.

Consistent with the foregoing, I conclude Plaintiff's argument rests on a questionable taint

that was in fact remedied and did not effect the substance of the reviewer's observations he seeks

to strike.  Under these circumstances, I cannot find a reason to strike an accurate part of the

record from consideration or conclude that Plaintiff was denied due process.

### (3) Matter Must Be Remanded For Additional RFC Finding
### & Vocational Expert Testimony Regarding SSI Benefits

Plaintiff contends that the ALJ "improperly rejected numerous medical assessments that

[he] suffered from a debilitating panic disorder." *Doc. 15* at 22.  He specifically challenges the

weight ALJ Lunderman gave to consulting physician Dr. Johnson, consulting psychologist Dr.

Krueger, treating physician Dr. Hochman, treating social worker Clara Chavez, and Barbara May.

Plaintiff relies on Dr. Carole W. Jones' 1993 report as evidence of the work restrictions that arise

from Plaintiff's panic attacks.  *Id.*  He also relies on the "reports and treatment notes" of Dr.

Johnson, Dr. Hochman, Dr. Krueger, Dr. Smith (the doctor who apparently supervised Ms. May's

counseling sessions, and whose treatment notes the ALJ did not discuss in her opinion), as

showing that "Plaintiff was severely limited by his depression, anxiety, and agoraphobia." *Id.* at

23.  As to his panic attacks, Plaintiff testified that the condition result in crying spells or

simulating the symptoms of a heart attack "about two times a day."  When they occur, he takes

his medication, which "controls it a little bit," and locks himself in a room until they pass. *Record* at 586, 591-92.

The ALJ did not find Plaintiff's testimony credible because "there is no medical evidence that substantiates the frequency of his panic attacks [and Plaintiff] had reported that Ativan controlled his panic attacks." *Id.* at 20-21. The ALJ credited Dr. Keilman's assessment that Plaintiff's "psychological problems were situational in nature, and would lessen when his personal problems improved or resolved." Based on Dr. Keilman's notes, the ALJ concluded that Plaintiff "did not have disabling depression or anxiety." *Id.* at 21.

There are two types of medical opinions: those that "speak to the nature and extent of a claimant's limitations" and those that speak to "the ultimate issue of disability, i.e., opinions about whether a claimant is capable of any work given his or her limitations." *Holohan v. Massanari,* 246 F.3d 1195, 1201 (9th Cir. 2001). Two of Plaintiff's physicians wrote letters on his behalf urging the Administration to find him disabled. These letters do not constitute substantial evidence warranting a reversal or remand. Although both doctors mentioned depression, they specifically found him disabled based on his ***back condition*** which is not at issue in this case.

Furthermore, both letters speak to the ultimate issue of disability. The ALJ gave little or no weight to Dr. Hochman's letter because he "does not specialize in orthopedic medicine." *Record* at 18. She rejected Dr. Novosad's opinion because his "diagnosis was poorly supported by acceptable clinical or laboratory diagnostic techniques" and his other notes contradicted his disability conclusion. *Id.* at 17. Moreover, a treating physician opinion that a patient is "disabled" is not dispositive of the issue of disability under the Social Security Act. *E.g., Castellano,* 26 F.3d at 1029.

An ALJ "is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." *Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001). Before an ALJ can properly disregard a medical report by a treating physician, she must give "specific, legitimate reasons" for doing so. *Id.* The reasoning must include consideration of several specific factors. Among those factors are: the degree to which the physician's opinion is supported by relevant evidence; consistency between the opinion and the record as a whole; whether or not the physician is a specialist in the area upon which an opinion is rendered; and "other factors brought to the ALJ's attention which tend to support or contradict the opinion." *Id.* While a failure to consider any of the factors is improper, an ALJ's failure to discuss each and every one of the factors is harmless. *E.g., Marquez v. Barnhart,* CIV 01-872 KBM (*Doc. 16,* at 5-7 & n.3).

Nevertheless, I find the ALJ's analysis flawed because it does not adequately distinguish between the different time frames represented by Plaintiff's long course of mental health treatment and relies solely on Dr. Keilman's report, which covers only a limited period of time. Unfortunately, the ALJ's lack of completeness and clarity amounts to more than a "mere" deficiency in opinion writing. Because I cannot substitute my own analysis for that of the ALJ and the evidence does not conclusively show that Plaintiff is entitled to benefits based on limitations from his panic attacks, the only appropriate disposition is to remand for further proceedings. Thus, the arduous process continues.

Dr. Keilman wrote her notes in November 1996 and, with that as the outside date for the closed period, the ALJ's opinion is sound. Up to that point Plaintiff's mental health was treated

by Dr. Hochman. ALJ Lunderman applied the proper procedure in rejecting Dr. Hochman's,[7] Dr.

Johnson's,[8] and Dr. Krueger's[9] reports and notes as not supporting any functional limitations from

Plaintiff's panic attacks. Therefore, the ALJ's decision as to benefits under Title II is supported

by substantial evidence. *See Record* at 15 (Plaintiff must have shown a disability "on or before

December 31, 1993, for [him] to be entitled to benefits under Title II").

As I understand it, Plaintiff's SSI claim remains at issue. *See id.* ("For Title XVI

purposes, the question . . . is whether the claimant has been under a disability at any time *since* his

---

[7] The ALJ reviewed treating psychiatrist Hochman's reports and treatment notes, noting that Plaintiff responded well to his medication when he took it properly and that he was doing some work throughout his treatment. *Record* at 18-19. The attached Appendix illustrates that this is an accurate characterization of these records. *See also infra* note 9.

[8] Consulting psychiatrist Dr. Johnson concluded that as of 1993, Plaintiff

> appears to have a significant panic disorder, meeting all of the criteria for
> panic disorder with agoraphobia. He also has numerous depressive
> symptomology which again meets criteria for major depressive episode.
> Unfortunately, these conditions continue despite treatment for the above
> noted conditions. There was no sign of any thought disorder and claimant
> appears competent to handle his own benefit payments.

*Record* at 235-36. ALJ Lunderman rejected this conclusion as establishing functional limitations on Plaintiff because Dr. Johnson "based his findings primarily on the claimant's own subjective statements" and because she found "ample cause . . . to question whether the claimant continued to be troubled substantially by his psychiatric complaints." *Id.* at 18. As for the period until 1996, this is accurate. *See supra* note 7; *infra* note 9.

[9] Cognizant of the Tenth Circuit's decision in *Cruse v. United States Dep't of Health & Human Servs.*, 49 F.2d 614 (10th Cir. 1995), the ALJ rejected Dr. Krueger's "poor," "no," and "fair" abilities because "none of the other psychologists or psychiatrists found the claimant had this degree of functional limitations in all of those areas," and because Dr. Krueger's inconsistent findings were evidence that he "was somewhat confused when he completed this portion of the form." *Record* at 20. The first reason – inconsistency with the other medical records – alone is sufficient to reject the report. Moreover, the 1993 report of reviewing physician Dr. Jones upon which Plaintiff relies found only moderate limitations and otherwise no significant limitations. Dr. Jones noted Plaintiff's mental impairments are "improving on medication" and found him able to perform "simple, routine, unhurried work." *Record* at 109; *see also id.* at 107-19.

SSI filing date) (emphasis added); *see also id.* at 84-87 (SSI application filed May 3, 1993). As discussed above, however, the earliest the closed period ended was February 25, 2000. Plaintiff ceased seeing Dr. Hochman in mid-1996. Around September 1997, approximately four months after ALJ Connor issued her second decision denying benefits, Plaintiff began treatment with Presbyterian Medical Services through Vistas del Sol Counseling Services.

ALJ Lunderman noted that Plaintiff was "evaluated with major depression in October 1997 . . . by a licensed social worker" according to an assessment authored by Ms. Chavez. *See Record* at 20 (citing Exhibit AC-2, the letter found at pages 548-50 in the record). The assessment indicates Plaintiff complained of "anxiety attacks that are severe and come frequently and without warning . . . since 1986." *Id.* at 548. The ALJ rejected Ms. Chavez' assessment because the "regulations do not consider a social worker to be an 'acceptable medical source' for purposes of diagnoses or treatment." However, the record indicates that as of February 1999, Plaintiff was under the treatment of medical Dr. Harris Smith, whose notes indicate that Plaintiff continues with "panic attacks [every] 3-4 days. Sleeps 3-4 hours at night . . . .05 mg Xanax doesn't handle the panic attacks – less crying spells since [increase] of Zoloft. Appears very anxious, fidgeting, squirming on edge of chair. Slow-oriented speech. Has difficulty expressing feelings." *Id.* at 580.

In addition, Ms. May and Ms. Sue Ann Wynn, both of whom work for Vistas del Sol, wrote a letter which indicates: a severe depression resulted in Plaintiff isolating himself in his room led to his wife leaving him; his "mental and emotional distress . . . seems to be a direct result of his [back] injury and inability to work and continue to interact and support his family;" and, although Plaintiff is "conscientious in keeping on-going counseling appointments . . . in view of

19

physical and financial stressors, this client does not have high hopes for improvement in his life situation." *Id.* at 343-44.  The ALJ rejected this letter as not containing "discussion of any underlying abnormal signs or findings during psychological evaluations." *Record* at 20.  As far as I can tell from the ALJ's opinion, however, she did not review the treatment notes from Presbyterian/Vistas del Sol.  *See Appendix* (entries beginning with September 1997 to end).

Furthermore, the ALJ plainly relied upon Dr. Keilman's 1996 report, which does not speak to events that happened afterward.  Although Dr. Vega's 1999 testimony was in accord with Dr. Keilman's report, the ALJ did not rely on Dr. Vega's testimony in making her residual functional capacity assessment.  *See Record* at 18-21.  Yet, it was Dr. Vega's description of limitations that was submitted to the vocational expert.  *See id.* at 607, 612-13.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion is granted in part and the matter is remanded to the Commissioner for further proceedings consistent with this opinion.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

20